BURKE, Judge.
Matthew Daniel Grantham appeals his guilty plea conviction of second-degree unlawful possession of marijuana, a violation of § 13A-12-214, Ala.Code 1975, and his resulting sentence of 60 days in jail, which sentence was suspended. He was also ordered to pay a $250 fine, $25 to the Victims Compensation Assessment Fund, and court costs.
On February 27, 2010, Grantham was arrested and charged with second-degree possession of marijuana and possession of drug paraphernalia. This case was originally prosecuted in the Tuscaloosa Municipal Court. Grantham filed a motion in the Tuscaloosa Municipal Court to suppress evidence, which was subsequently denied. On May 20, 2010, Grantham stipulated to the facts of the charges and pleaded guilty to both charges. Grantham appealed his conviction for second-degree possession of marijuana to the Tuscaloosa Circuit Court.
On October 5, 2010, Grantham filed a motion to suppress the evidence resulting from the search and seizure of the evidence in this case, alleging that the law-enforcement officers did not have probable cause for a search; that they did not have specific and articulable facts that were sufficiently corroborated and necessary to perform a stop and frisk under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); that the officers performed an unlawful warrantless search of the vehicle; and that the officers conducted a custodial interrogation without first informing him of his Miranda[1] rights.
On February 4, 2011, the circuit court held a suppression hearing. At the beginning of the hearing, Grantham entered into evidence a video recording of the incident that was taken from the police vehicle during the incident. At the hearing, Sgt. Billy Gene Hallman, Jr., of the Tuscaloosa Police Department testified that, on February 27, 2010, he was driving on 35th Street and his attention was drawn to the vehicle in which Grantham was riding. When the vehicle passed Sgt. Hallman’s vehicle, he noticed that the passenger, who was later identified as Grantham, was not wearing a seat belt. Sgt. Hallman then turned his vehicle around, caught up to the vehicle, initiated his emergency lights, and stopped the vehicle. As he made the traffic stop, he observed Grantham make what he considered to be a furtive movement by reaching over the middle console area with his right arm. However, Sgt. Hallman did not see anything that he could clearly determine to be a weapon or anything else in Grantham’s hand. Sgt. Hallman testified that Grantham’s actions made him suspect that he might be trying to hide something. Sgt. Hallman then approached the car, identified himself, and retrieved the driver’s and the passenger’s information. As he approached the driver’s side of the vehicle, Sgt. Hallman noticed that the driver was wearing a dark brown nylon-type jacket with a furry collar, that he described as “typically used in law enforcement,” and “reminded [him] of the old Tuscaloosa County Sheriffs Office uniforms that they had before they changed.” *177 (R. 10.) The jacket did not have any badges or insignia, but Sgt. Hallman stated that it had a place capable of holding a badge on the left front chest. Sgt. Hall-man stated that the jacket raised a little suspicion because police officers deal with people who impersonate law enforcement and try to stop cars or approach people and fraudulently identify themselves as law enforcement. Sgt. Hallman questioned the driver concerning the jacket and then returned to his vehicle to run a computer check on the driver and the passenger.
At that time, another police unit responded to the location. The computer check revealed that the driver had a history — a second-degree-possession-of-marijuana charge. Sgt. Hallman approached the vehicle again, and asked the driver to get out of the vehicle, and the driver cooperated. Sgt. Hallman questioned the driver regarding the marijuana charge and testified that the driver was calm, cooperative, and answered every question he was asked. During this questioning, Grantham was still in the front passenger seat of the vehicle. The backup officer, Officer Hinton, was watching Grantham in the passenger seat. Sgt. Hallman asked the driver about the jacket, and the driver responded that the jacket belonged to his ex-girlfriend’s father. He further replied that he liked to wear the jacket and that it kept him warm. Sgt. Hallman then asked the driver for permission to search his vehicle, and the driver gave his consent.
After Sgt. Hallman had secured the driver’s consent to search the vehicle, Officer Hinton asked Grantham, who was still sitting in the front passenger seat, to get out of the vehicle. While Officer Hinton was talking to Grantham, Sgt. Hallman was finishing patting down the driver. When Officer Hinton initially asked Grant-ham to get out of the vehicle, Grantham refused. Sgt. Hallman then began to walk around the rear of the car toward the passenger side, and Grantham got out of the vehicle. After Grantham was outside the vehicle, Sgt. Hallman asked him to turn around and put his hands on the trunk so that .he could be patted down for the officer’s safety. Grantham was facing Sgt. Hallman and repeatedly asked Sgt. Hallman why he had to do that. Sgt. Hallman then physically turned Grantham around, placed his hands on the trunk of the car, and patted him down.
While patting Grantham down, Sgt. Hallman felt a rectangular shaped object in Grantham’s left front pocket. The object had grooves on its side and two inden-tions on its top. Sgt. Hallman stated that, based on his training and experience, he thought the object felt like a “dug out” that was commonly used to store marijuana and a smoking pipe. (R. 14.) Sgt. Hallman then removed the object from Grantham’s pocket and confirmed that it was a “dug out” containing marijuana and a pipe. Grantham then admitted that the dug out was his.
Grantham and the driver were then placed in handcuffs, and Sgt. Hallman searched the vehicle. Sgt. Hallman first searched the middle console area where he had earlier observed Grantham reach. He found additional marijuana and marijuana seeds in the console. Sgt. Hallman stated that both the driver and Grantham were then placed under arrest.
After Sgt. Hallman’s testimony, the State rested its case, and the defense did not present any witnesses. The circuit court took the case under advisement. On February 25, 2011, the circuit court issued an order denying Grantham’s motion to suppress. The circuit court’s order stated:
“[Grantham’s] motion to suppress was heard on the record on February 4, 2011. The brevity of this order does not *178 reflect the time and attention devoted to the matter. The jacket and prior arrest record were not sufficient reasons to detain the driver or passenger. However, after reviewing the totality of the circumstances and other factors, I do not find the seizure of the evidence to be the result of a constitutionally impermissible process. Therefore, the motion to suppress is denied.”
(C. 30.)
On April 2, 2012, Grantham pleaded guilty to second-degree possession of marijuana. During his guilty-plea proceeding, Grantham gave the trial court oral notice of appeal, reserving the right to appeal the circuit court’s denial of his motion to suppress. The City of Tuscaloosa also moved to dismiss the charge against Grantham for possession of drug paraphernalia and that charge was dismissed. On April 13, 2012, Grantham filed this appeal.
On appeal, Grantham argues that the circuit court erred in denying his motion to suppress because, although he concedes that the initial traffic stop was lawful and based on sufficient probable cause, the officer was constitutionally unjustified in performing a patdown of him because the officer failed to point to any articulable, reasonable suspicion that he was involved in criminal activity or that he was armed. Specifically, Grantham argues that the arresting officer could not point to any specific, articulable suspicion of criminal activity “other than vague hunches in regard to the jacket the driver was wearing and a slight reaching movement by [Grantham],” and, thus, the arresting officer was not constitutionally justified in patting him down. The State contends that Sgt. Hall-man lawfully conducted a patdown of Grantham because, based on the totality of the circumstances, Sgt. Hallman could have formed a reasonable suspicion that Grantham was armed and dangerous.
In State v. Landrum, 18 So.3d 424 (Ala.Crim.App.2009), this Court explained:
“ ‘This Court reviews de novo a circuit court’s decision on a motion to suppress evidence when the facts are not in dispute. See State v. Hill, 690 So.2d 1201, 1203 (Ala.1996); State v. Otwell, 733 So.2d 950, 952 (Ala.Crim.App.1999).’ State v. Skaggs, 903 So.2d 180, 181 (Ala.Crim.App.2004).”
State v. Landrum, 18 So.3d at 426. Because the evidence presented at the suppression hearing is not in dispute, the only issue before this Court is whether the circuit court correctly applied the law to the facts presented at the suppression hearing, and we afford no presumption in favor of the circuit court’s ruling.
“All evidence obtained by a search that is conducted in violation of the Constitution of the United States is inadmissible in a state court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Loyd v. State, 279 Ala. 447, 186 So.2d 731 (1966). The Fourth Amendment to the Constitution of the United States bans all unreasonable searches. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Whether a search is unreasonable depends upon the facts and circumstances of the particular case. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Warrantless searches are per se unreasonable, unless they fall within a recognized exception. Ex parte Hilley, 484 So.2d 485 (Ala.1985). Those exceptions include: objects in plain view, consensual searches, a search incident to a lawful arrest, hot pursuit or emergency situations, probable cause coupled with exigent circumstances, and a Terry [v. Ohio, 392 U.S. 1 (1968),] ‘stop and frisk’ situation. Daniels v. State, 290 Ala. 316, 276 So.2d 441 *179 (1973). Where a search is executed without a warrant, the burden falls upon the State to show that the search falls within an exception. Kinard v. State, 335 So.2d 924 (Ala.1976).”
Ex parte Tucker, 667 So.2d 1339, 1343 (Ala.1995).
“ ‘Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), law enforcement officers may conduct investigatory stops of persons or vehicles if they have a “reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur.” ’ ” State v. Davis, 7 So.3d 468, 470 (Ala.Crim.App.2008), quoting Wilsher v. State, 611 So.2d 1175, 1179 (Ala.Crim.App.1992)(internal citations omitted). When an officer stops a suspect pursuant to Terry, the officer “ ‘ “ ‘is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.’ [Terry,] 392 U.S. at 30, 88 S.Ct. 1868.”’” Smith v. State, 884 So.2d 3, 9 (Ala.Crim.App.2003), quoting Riddlesprigger v. State, 803 So.2d 579, 582 (Ala.Crim.App.2001).
“This Court has recognized that a traffic stop is ‘ “ ‘more analogous’ to the brief investigative detention authorized in Terry” ’ than custody traditionally associated with a felony arrest. Sides v. State, 574 So.2d 856, 858 (Ala.Crim.App.1990), quoting Pittman v. State, 541 So.2d 583, 585 (Ala.Crim.App.1989), quoting in turn Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In stopping a vehicle for a traffic violation, a police officer has, in Fourth Amendment terms, seized the driver, Cains v. State, 555 So.2d 290, 292 (Ala.Crim.App.1989), quoting Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), as well as any passenger, Brendlin v. California, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). Furthermore, so long as the police officer has properly seized the occupants of the car, the officer may order the driver, Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), or a passenger, State v. Hails, 814 So.2d 980 (Ala.Crim.App.2000), cert. denied, 814 So.2d 988 (Ala.2001), recognizing Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), out of the car without violating the Fourth Amendment. See, State v. Abner, 889 So.2d 52, 53-54 (Ala.Crim.App.2004) (recognizing the applicability of Mimms and Wilson in Alabama).
“When a police officer properly seizes a vehicle for a traffic violation, the police officer may not only order the driver out of the vehicle, but may also pat down the driver for weapons if the officer reasonably believes that the driver is armed and dangerous. Mimms, 434 U.S. at 112, 98 S.Ct. 330. Recently, the United States Supreme Court expanded the Terry traffic stop jurisprudence in Arizona v. Johnson, 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), holding that, as with a driver suspected of carrying a weapon, a police officer may also order a passenger out of a vehicle and conduct a patdown of a passenger if the officer reasonably believes that the passenger is armed and dangerous. The Supreme Court explained:
“‘[I]n a traffic-stop setting, the first Terry condition — a lawful investigatory stop — is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity. To justify a pat-down of the driver or a passenger during a traffic stop, however, just as *180 in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.’
“555 U.S. at 327,129 S.Ct at 784.”
B.A.H. v. State, 28 So.3d 29, 32 (Ala.Crim.App.2009) (internal emphasis omitted).
In State v. Hails, 814 So.2d 980, 986 (Ala.Crim.App.2000), this Court stated the following:
“ ‘Police may conduct a pat-down search without a warrant if, under the totality of the circumstances, the officer has an articulable, reasonable suspicion that a person is involved in criminal activity and that he is armed. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The reasonableness of the search is measured objectively. If a reasonably prudent person would believe that his safety, or the safety of others, is endangered, he may conduct a limited search of outer clothing to discover any weapons. Id. at 27, 88 S.Ct. 1868.’
“United States v. Raymond, 152 F.3d 309, 312 (4th Cir.1998). ‘And in determining whether the officer acted reasonably in such circumstances, due weight must be given ... to the specific reasonable inference which he is entitled to draw from the facts in light of his experience.’ Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).”
State v. Hails, 814 So.2d at 986.
“ ‘Reasonable suspicion is a less demanding standard than probable cause,’ Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), requiring only that the detaining officers ‘have a particularized and objective basis for suspecting the person detained of criminal activity,’ Webb v. State, 500 So.2d 1280, 1281 (Ala.Crim.App.), cert. denied, 500 So.2d 1282 (Ala.1986).” Wilsher v. State, 611 So.2d 1175, 1179 (Ala.Crim.App.1992). “To justify the investigatory stop and patdown search, the officer’s actions must not be in response ‘to his inchoate and unparticularized suspicion or “hunch,” but [must be in response] to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.’” Ex parte James, 797 So.2d 413, 415 (Ala.2000) (quoting Terry, 392 U.S. at 26) (emphasis omitted). Thus, “[i]f a reasonably prudent person [in the officer’s shoes with the officer’s experience and training] would believe that his safety, or the safety of others, is endangered, [the officer] may conduct a limited search of outer clothing to discover any weapons.” State v. Taylor, 46 So.3d 504, 508 (Ala.Crim.App.2010) (citations and quotations omitted). “ ‘This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that “might well elude an untrained person.” ’ [United States v.] Arvizu, 534 U.S. [266] at 273, 122 S.Ct. 744 (quoting [United States v.] Cortez, 449 U.S. [411] at 418, 101 S.Ct. 690).” Muse v. State, 42 So.3d 789, 792 (Ala.Crim.App.2009).
Here, Sgt. Hallman did not articulate facts that would support a reasonable suspicion that Grantham was involved in criminal activity or that he was armed. Other than stating that he saw Grantham reach over the middle console of the vehicle, Sgt. Hallman failed to provide any details that would lead a reasonable person to suspect that Grantham was involved in criminal activity. “Furtive gestures may be taken into account in determining whether probable cause exists.” Walters v. State, 585 So.2d 206, 209 (Ala.Crim.App. *181 1991). As the Alabama Supreme Court noted in Ex parte Tucker, 667 So.2d 1339 (Ala.1995), a furtive movement, when not a flight, “is typically some stealthy act to conceal an object from initial view by the police or by strangers or to quickly dispose of the object.” 667 So.2d at 1347-48. The Alabama Supreme Court stated the following regarding such furtive movements:
“ ‘[Deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.’
“Sibron [v. New York], 392 U.S. [40,] 66-67, 88 S.Ct. [1889,] 1904 (citations omitted). Professor LaFave has commented upon this language as follows:
“‘Thus, if the police see a person in possession of a highly suspicious object or some object which is not identifiable but which because of other circumstances is reasonably suspected to be contraband, and then observe that person make an apparent attempt to conceal that object from police view, probable cause is then present.’
“W. LaFave, 2 Search and Seizure § 3.6(d) at 58 (2d ed.1987).”
667 So.2d at 1347.
However, in this case, there was no pri- or reason to suspect criminal behavior other than a seat-belt violation. The stop was made in the middle of the day, and there was no indication that the stop was made in an area that was often patrolled because of high crime rates. There was no indication in the record of any activity by the vehicle or its passengers that would have suggested involvement in criminal activity. Sgt. Hallman stated that he did not see any object in Grantham’s hand but that Grantham’s movement made him “suspicious that they might be trying to hide something or — not quite sure what was going on. But he did make a furtive movement during the initial traffic stop.” (R. 9). Sgt. Hallman did not indicate that he saw Grantham open the console, and he stated that he did not see anything in Grantham’s hand. When he approached the car, Sgt. Hallman did not observe any weapons, shell casings, firearm cases, knives, or knife sheaths in the car. He did not smell or see marijuana or other illegal substance. Additionally, Sgt. Hallman did not indicate that Grantham was nervous or belligerent. Although Grantham initially indicated that he would not willingly get out of the vehicle, he did not become aggressive and he subsequently voluntarily got out of the vehicle shortly after he was ordered to do so. Likewise, when Grant-ham first questioned why Sgt. Hallman was requesting consent to a patdown, there was no testimony that Grantham became aggressive or belligerent; rather, it appears from Sgt. Hallman’s testimony that Grantham was merely asserting his right to privacy by withholding his consent.
The State further argues that the driver’s jacket, which Sgt. Hallman stated resembled a law-enforcement officer’s jacket, contributed to Sgt. Hallman’s suspicion that the driver and Grantham were engaged in criminal activity or were armed. However, Sgt. Hallman testified that the jacket did not contain any badges or insignia; that he did not witness the driver or the passenger taking any action that would warrant a suspicion that they were trying to impersonate a police officer; and that, when Sgt. Hallman questioned the driver about his jacket, the driver calmly responded to his questions. The driver’s vehicle did not have any markings or lights on it that indicated that the suspects were *182 involved in the criminal activity of pretending to be law enforcement. Without more, we cannot say that the officer’s suspicions about the jacket the driver was wearing were more than an “inchoate and unpartic-ularized suspicion or ‘hunch,’” and, thus, those facts cannot provide the officer with a reasonable suspicion that would justify a patdown under Terry. See Ex parte James, 797 So.2d at 415. Thus, looking at the totality of the circumstances, we cannot say that Sgt. Hallman had a particularized and objective basis for suspecting Grantham of being involved in criminal activity or of being armed, which is required to justify a patdown under Terry. See State v. Hails, 814 So.2d at 986. Accordingly, we find that the circuit court erred in denying Grantham’s motion to suppress.
Although the dissent argues that, because the driver consented to a search of the car, the inevitable-discovery rule would have been a viable option for the State to argue that the patdown and seizure was proper, the State did not ever raise this issue — at trial or on appeal. See State v. Spears, 560 So.2d 1145, 1152 (Ala.Crim.App.1989) (“In showing that the inevitable discovery exception should apply, the State must carry the burden of proving by a preponderance of the evidence that the initial search or information gained therefrom was not used in any way to gain the defendant’s consent, see United States v. Freiwald, 661 F.Supp. 559, 562 (C.D.Cal.1987), and that the evidence and information discovered during the illegal search would ultimately or inevitably have been discovered by the lawful means of the consent search. In addition, the State must prove the voluntariness of the consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).”). For this Court to reach this issue and find facts in the record to support this theory would require this Court to engage in a speculative fact-finding expedition. It is impossible to glean from the record whether Grantham, as the passenger, would have been held for a possible constructive possession charge or could have been released. This Court is not intended to be a fact-finding body; that duty is left to the trial court or the jury, depending on the circumstances of the case. See e.g. Floyd v. State, [Ms. 1080107, September 28, 2012] — So.3d -, -(Ala.2012), (Murdock, J., concurring in the result). Therefore, to contrive or conceive this theory would require this Court to abdicate its duty as a neutral arbiter of the law and could instead relegate its role to manipulating the facts.
Based on the reasons stated above, the judgment of the circuit court is reversed, and this cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
WELCH, KELLUM, and JOINER, JJ., concur.
WINDOM, P.J., dissents, with opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).